Good morning. I'm Stephanie Marcus from the Department of Justice, and I represent Sylvia Burwell, Secretary of Health and Human Services. I would like to reserve five minutes for a rebuttal with the court's assent. All right. Thank you. In this case, the Plaintiff Hospitals challenged the Secretary's determination of their Disproportionate Share Hospital Adjustment, known as the DISH Adjustment. The DISH Adjustment is an additional payment, additional Medicare payment that is made to hospitals that serve a disproportionate share of low-income patients. And in this case, the underlying issue has to do with patients who are both eligible for Medicaid and entitled to Medicare benefits under Part A. And here, the District Court correctly sustained the Secretary's interpretation of the DISH provision of the Medicare statute. It involves, it's a calculation, a formula that involves two fractions, the Medicaid fraction and the Medicare SSI fraction. And here, the Medicaid fraction, the statutory language on its face, does not include patients who are entitled to Medicare Part A. And once the District Court correctly sustained that interpretation, that should have been the end of the matter, but the District Court nonetheless granted judgment for plaintiffs on the vast majority of the cost shares at issue based on two erroneous legal determinations. And those are the subject of our appeal. And the first one was that the District Court concluded that the notices of reopening sent by the intermediary were inadequate. This holding was error because the applicable regulation had only two requirements, both of which were satisfied by these notices of reopening. And the District Court did not cite this regulation and instead invalidated the reopenings based on a provision of the provider reimbursement manual, which was not even necessary to look at since the regulation itself on its face merely required that the hospitals get written notice of the reopening, which they did. Are you talking about 405? I'm talking about 405, and it is in our statutory and regulatory addendum, B9405.1887, which says that all parties to any reopening described above shall be given written notice of the reopening. So then there's nothing in the rest of that reg that tells us what the written notice must contain. That's right, Your Honor. But you've promulgated, your client has promulgated a manual for its intermediaries that does not tell them what a notice should contain. Well, Your Honor, when we have a... Is that right factually? Yes. Yes. There's a provider reimbursement manual provision that does discuss what a notice of reopening, but our point is that the regulation that has the force of law has two unambiguous requirements, both of which were met here, and it's therefore error to invalidate a reopening that, especially where, as here, it results in a payment to these hospitals of millions of dollars that they're not, that the district court agreed they're not entitled to under the Medicare statute. And secondarily, Your Honor, the district court in any event erred by not deferring to the secretary's interpretation of her own regulations. Here, we submit that you don't need to reach this point. The notices did substantially comply with the PRM. Why should we defer to... There's a regulation, 1887, 405-1887, that just says written notice. That, to me, seems a little ambiguous because it doesn't tell us what it means. The secretary's then promulgated a manual with very specific specifications about what the notice should contain. Why should we defer to the secretary's interpretation of that? Well, here, Your Honor, we... the notices should describe the circumstances giving rise to the reopening, and you have an administrator's decision that you're reviewing under the APA standards, and the administrator has a detailed and thorough discussion about why these notices complied. And as the administrator pointed out, these notices, and these notices are in the My question was, why should we defer to the administrator's interpretation of the guidelines? If an agency... We defer to an agency when it comes to interpreting in ambiguous terms of the statute. But if the agency can write an ambiguous regulation or manual, and then we have to essentially unfettered powers to do whatever they want by bootstrapping one ambiguity on top of another. With due respect, Your Honor, that's not what we are asking the court to do here. Okay. There is a regulation which is not ambiguous. It simply provides the requirements for a notice, and then there's nothing that  So there is a clause at which the secretary is... And what the secretary is interpreting and what's entitled to deference is what these requirements in the Regulation 1887 mean. And here, the intermediary notices completely satisfy those two requirements. And if you are also... So, you know, based on this court's case law that says a PRM is an interpretive guide that doesn't have a force of law, what's important is to look at the regulation that does have a force of law and that is binding and that the providers had notice of. But again, I think even on the face of the PRM here, the notices themselves inform the hospitals that their cost reports would be reopened to reexamine the relevant statute and the relevant regulation. And as the administrator pointed out, that was not too broad because it gave the hospitals the opportunity to present evidence of days that could be added back in the fractions. As I understand your argument on this point, you really have a threefold argument. You're saying, first, that it's the regulation which controls, not the provider reimbursement manual, and we complied with the regulation. Secondly, to the extent the provider reimbursement manual is relevant, the notices that were sent substantially complied even with that. And third, to the extent it's even arguable that there wasn't compliance with the provider reimbursement manual, any omission is harmless because it's clear from the circumstances of the notice and the dialogue that the hospitals knew precisely what the secretary's problem was. Yes, sir. Thank you. So you're arguing all three of those points, as I understood your brief. Yes, that is exactly right. And you've summarized our argument very well. And on the harmless error point, the plaintiffs have waived any allegation of harmless error here. The secretary raised the argument in district court, and the plaintiffs did not respond by explaining what they would have done differently with a different notice. And the district court erred by failing to reach that argument. And the circumstances surrounding these notices are apparent from the record. The plaintiff's complaint in the appendix, page 19, has an allegation that says in May 2003, just before most of these notices are reopening, the intermediary announced that it was going to remove these disputed days from the dish calculation, and the allegation said it threatened to recover any excess dish payments pending discussions with CMS. So the plaintiffs, even on the face of their complaint, showed they knew about this, and their witness at the board hearing acknowledged that they knew exactly what this was about very shortly after receiving the notices, that they had meetings with the intermediary and with CMS officials. And we submit that given all of this evidence, in addition to the fact that the Medicare statute regulations, secretary's instructions, and policy guidance all show that these patient days had to be excluded so that the result would not have been any different had any other notice been given. Can I move your train of thought at this point to whether or not the settlement agreements reached by the fiscal intermediary as to what force they have and to what extent are they binding? The administrative resolutions are not binding on the secretary. These are resolutions entered into by the intermediary and the providers during administrative proceedings before the provider reimbursement review board, and the secretary is not a party to those proceedings. The secretary has set up the mechanism, and what's the point of a settlement agreement or what you call an administrative resolution if the secretary can walk away from it any time she chooses? Your Honor, in many cases, these administrative resolutions are not controversial and simply resolve an issue that's before the board, and I would note that in this case, as we pointed out in our brief, if you look at the face of these administrative resolutions, the ones that are in the record show that the intermediary was purporting to implement the secretary's ruling 97-2, and if that indeed is what the intermediary had done, that would have been fine. That would have added the days that were supposed to be added based on that ruling, and it would not have added these days that the intermediary never was supposed to add. It actually, in any of these agreements where the intermediary did add the days at issue, it was violating the face of its own agreement because the instructions for implementing the very ruling that the intermediary said it was implementing are very clear. Are you saying these settlement agreements are binding one way, effectively? They're binding on the plaintiffs, but they're not binding on you? They are. Isn't that the result of your position is because the plaintiff withdraws and doesn't pursue their challenge, hence the time runs on it, and after the time runs, the secretary can say, I don't like the agreement. I'm going to pocket the concession and challenge just the carrot that they got for that concession. I think that's what you're saying. But the secretary is not a party to this. It's just like the same as a- I'm just trying to understand practically. We'll get to whether it's right or wrong. Am I correct that the bottom line on what you're saying is that the hospitals need to understand that when they enter into one of these agreements and let the time run, they are forever bound by whatever concessions they have made in entering into the agreement, but the secretary is not bound by whatever quid pro quo the hospitals felt they got from the administrator, from the intermediary? Well- Is that correct? I think it is correct in that, yes, the providers forego what they're appealing before the board. Like here there was a valid issue of days that the secretary had previously excluded from the fraction, and after a series of adverse court of appeals rulings, the secretary in this ruling 97-2 decided to include all days where a patient was Medicaid eligible, not just where Medicaid paid. And that was the issue. So the- I couldn't hear you. In return for that- I couldn't hear you, yes. Well, no, I actually am not fully- they are at that point, you know, it depends on what they say in each agreement, of course, and if they are foregoing the rest of the appeal, that's the purpose of it, so to save administrative resources. But what is important is the intermediary and the board- on this issue, the providers didn't prevail before the board either. The board ruled for them on the notices, but not on this issue. What it obligates the intermediary to do, and what the agreement shows and the plaintiffs should know, is that the intermediary has to issue a revised NPR with this agreement. And thereby, the intermediary is foregoing the administrative process also. It is not making arguments anymore about the days that are covered in the agreement. It is- so it does have to issue the revised NPR. The board correctly found that the administrative resolution was irrelevant to this appeal once the board- once the intermediary issued the NPR. It is not making arguments anymore about the days and all that those entail. I would like to reserve the remainder of my time for rebuttal. Thank you. William Stiles. Good morning, Your Honors. My name is William Stiles, and along with my colleague, Nora Schmidt, we represent the eight main hospitals that are the appellees and cross appellants. And if I may, as the cross appellant, reserve three minutes of my time. We'd rather hear your argument. Okay. But it was a nice try. You never know what you're going to get until you ask. Let me- let me- let's see if we can go two for two. Before you get into the merits of your argument, we do have your supplemental briefs about jurisdiction. And I don't want either counsel to assume that that's a settled or          Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. I get to that.  Uh, is there any more you would like to say on that? This is your opportunity. Um, I believe we've covered it and I- I would also say that- it's the one thing that we appear to agree on, that this court does have jurisdiction over this matter. Um- Do we have to interpret what happened, with the district court did as a remand, in order to apply the principles that you say should be applied to give us jurisdiction? I think that's their only job in this case, is- is once they've been remanded the case- But the district court didn't order a remand. Not specifically. Not at all. Its judgment said- its judgment said nothing about a remand. But in this case, your honor, I think the supreme court has been clear- I think this court has been clear that that's the district court's job. We've certainly requested remand. They didn't give it to us. We can't, um- I'm not sure- the same with the interest expense request, that is something that arises by operation of statute when we're the prevailing party. That is, the statute is directed at the court. Um- But- but you see, we have a situation where the- where the district court, all right, originally set out to resolve the remaining issues. You know, it asked the parties to give it some additional information so it could resolve those issues. And the parties came running into the district court- or to the magistrate judge, same thing- and said, oh no, no, no, don't do that. It will adversely affect our rights to appeal. And so the district court didn't disclaim its ability to do that. It merely eliminated a sentence from its- from its original decision. And so we now have- have a judgment that has no remand, no overt signal from the district court that once this appeal is over, it will not proceed to resolve these issues. And that was the correct- in terms of not correcting the issue, they certainly asked for additional information. Um- however, the question of law is what is the effect of the legal written settlement agreements? Um- the court determined that the secretary had it wrong, that these can be enforceable, and that that precluded the reopening. Um- so it resolved the legal question, and we would certainly ask you to- order the district court to remand the case for further proceedings consistent with the legal determinations. We would like it to be consistent with the legal determinations that were made below with respect to their appeal and with respect to our cross-appeal. We have three issues that we would like to discuss today. Well, that's the point. You don't want- if we just issued an opinion that said affirmed, you'd all be in a bind. You need us to say that the district court didn't do it quite right. The district court were- we were, for example, affirming its rulings, but we're saying that it erred by not remanding. You need us to say that. Yes, and I would also like you on that remand to award us interest in accordance with the statute that applies to Medicare- Well, your supplemental briefs go to some pains to say that it's not our place to award interest, that that's got to be done by the secretary. You wouldn't award the specific amount, but you would order the court to issue- once they calculate the impact of the court's ruling, they would- if the decision below is upheld with respect to the 24 of the 29 cost reports, they would add back the days that they took out. And that would have a last- I mean, that's really a strange request, counsel. All right? Here the district court doesn't rule on the request to make an order with respect to interest, which is in itself a possible basis for saying that its judgment is not final. You argue that the judgment is final because the district court shouldn't have entertained that anyway, should leave it to the secretary. And now you want us to order the district court to make exactly the order  we believe that the district court- I mean, that's a weird Goldberg contraption as far as- We're not asking for a specific amount of reimbursement. No, I know that. And the district court's- But you're asking us to rule on an issue that the district court didn't resolve and that hasn't been briefed. That's what you're asking us to do. What we're asking for- And that makes me think that the judgment below isn't final because there's an issue the district court should have ruled on, which it didn't. See, if the district court wants to rule on the interest, you're necessarily implying that the district court got it wrong by not ruling on the interest, and yet we know from the record the district court didn't address the issue, and then you've just defined a situation in which we don't have appellate jurisdiction. So I think if you want us to have appellate jurisdiction, the only way we get it is to say that the interest issue is premature. It's a calculation that comes following whatever remand proceedings go on, and that the district court therefore resolved everything that it could possibly resolve that was for it, and it simply forgot to put remand on its judgment. I think that will get us the result that we're looking for, yes. So I think we can assume you're not asking us to say anything about interest. If that's what it takes. Our position is that the statute is directed at the court. It says the court will award interest to the prevailing party in this case, and the district court did not do that. We think that was a mistake, and that could be rectified on remand. Why we're here today, Your Honor, is the hospitals that I represent trusted the Medicare program, and they followed the intermediary's clear written instructions to include the non-SSI type six days that are at issue. And many years later, the Medicare intermediary removed these very same days and required the hospitals to repay the millions of dollars at issue. But that's the way the whole system is set up to work, right? The intermediary issues one of these final resolutions. You're happy you've got it, but you're still hanging out there for a while. It could be reopened. That's the statutory scheme. I don't think that that is. I think that's what the secretary would like the court to believe, but I think the final determination is more than that. There is a final determination. It has a meeting. It's called a final determination, and there are exceptions to that process.  I guess to describe the process, how it works, the hospital each year files a cost report that details the cost that it believes are covered by the program. The Medicare intermediary spends several years auditing that cost report before it issues what's called an NPR, and that's a notice of program reimbursement. That is the Medicare program's final determination of the amount of reimbursement due to the hospitals. And that final determination may only be disturbed through one of two processes, and that's one is an appeal. A provider can take an appeal, and that appeal has to be filed within 180 days, or it can be reopened. And both of these rules are time-limited, and they're subject to carefully delineated rules because in our view. So what was wrong with the reopen here? The PRM describes a process in terms of the notice that's required to be given to hospitals in the time of it. Okay, so let me go back to my prior point. Your client knew it was in a scheme in which whatever it agreed to with the intermediary could be reopened as long as done properly by the secretary. I would not say that we were in a, I guess I'm troubled by the word scheme. What happened in this case was. It's the way the program worked. When you got the intermediary signing off on something, you walk back to your client, and your client said, can I thank this? Is this good? You would have said to your client, no, we could challenge it if we do so within 180 days, and your client says, I'd like it. And then you would also say to your client, but it's still not good because as long as the secretary acts within a certain number of days and serves a proper notice, the secretary can reopen this so it's not final. That's what you'd say to your client. The final determination or the NPR determination is typically not looked at that way by the hospital industry. There is a possibility of that, yes, but it's not something that they would reserve money for. Isn't it correct that the secretary can reopen it under the statute? It is absolutely correct. So let's get to. So your only hope here on that is that either they didn't reopen it effectively or the administrative settlement agreement precluded them from doing so. That's correct. I mean, on a cross-appeal, we would also argue that we believe the days should be included, and for a period of seven years, and typically the Medicare fiscal intermediary does not provide, they provide very conservative advice. They're always telling hospitals this isn't allowed, that isn't allowed. In this case, they told the hospitals that the days should be included. They provided written instructions for including them. They encouraged the hospitals to include them, and this went on for a period of almost seven years. So this is not a situation in which the hospitals were trying to slip something by the Medicare program. This was something that was carefully considered to the extent that the secretary is suggesting that the intermediary didn't know what it was doing, or it was doing, it did this, it included these days by accident. I think the record demonstrates that that's absolutely false. The fact that the providers, this started on an appeal, they explained exactly what they were trying to do. You also have to look at the time period in which this was occurring. I think the secretary here is asking the court, say, well, we've clarified this issue subsequently, and we would like to then retroactively apply this to a time period that's long ago past. And the hospitals, in terms of the harm that they face, a lot of these cost reporting periods relate back to the 1990s, 1991, 1995, 97, 98. We're now standing here in, well, we were standing in 2006, 2007, 2008, 10 to 15 years later, and they're taking back money that the hospitals were told by the Medicare program that they were entitled to. They made decisions based on budgeting decisions, staffing decisions. They bought equipment. All that stuff can't be undone. You're saying the intermediary combined the secretary. That's the bottom line on what you're saying. Well, it's certainly the intermediary under the statute. Are you saying that the intermediary combined the secretary by telling the hospitals that they can do something which the law actually does not allow them to do? Well, I think what... But that's implicit in the question. Well, implicit within the question is, at the time they were told that, whether that was clear. The secretary, as we've explained in our briefs, she's changed her position on these various components of the dish and what days can be included and what days can't be included. It's helpful. We're just trying to understand your argument so we can work with it. Yes, we believe that the settlement agreements are binding, and we believe that the Medicare statute creates a system in which the secretary hand-selects agents to implement the system. I'm trying to understand. It doesn't mean we accept it or reject it, but we want to understand your argument. Are you arguing that if the intermediary tells a hospital it can do something and the hospital in good faith relies on it and does it, and then the intermediary signs off on it with one of those final resolutions, that the secretary is then bound and can't reopen to assert that what the intermediary told the hospital it could do, in fact, is prohibited by the law? Is that the principle that you would like us to adopt? I would not go that far. Okay. Then why are we even talking about what was said to the hospitals by the intermediary when they incurred the expenses? Because there is a statute in the Medicare provision. It's Title 42, Section 35, 1395GG, and that provision talks about overpayments. In this case, there's alleged to be an overpayment, and that statute creates an opportunity that says that a provider that is without fault with respect to that overpayment does not have to repay it. That is further delineated in another one of the secretary's manuals called the Medicare Intermediary Manual, where they define the concept of being without fault. And there's a two-prong test. The first is that the provider made full disclosure, and the second is that the provider had a reasonable belief that it was entitled to the payment. Or, so there's an alternative in the second prong, is if they had any questions, they brought those questions to the intermediary's attention. We believe we've satisfied those. So in terms of the Medicare program, we believe it answers that question, that the Medicare fiscal intermediary's advice isn't always binding, but it can be with respect to a situation in which the provider made full disclosure and had a reasonable belief that it was entitled to the money. We believe we meet both of those criteria. The position papers which are on the record describe exactly what was done. There was a meeting held before the first written settlement agreement in which that particular hospital and its representative sat down and discussed the matter with the intermediary. There were a lot of cases going on in the 90s addressing various aspects of the dish payment, and the hospital wanted to be sure that the intermediary understood what was going on in this case. And they did. And they subsequently issued written instructions that match exactly what the providers said that they were doing. And then they gave those instructions to the hospitals that were eligible for dish. And for a period of seven years, they told the hospitals that they should be claiming these days, and then they changed their mind. So the Secretary's response, as I understand it, is that 1395GG, which I think is the provision you're relying on, only applies to recovery of payments to individuals so that you'd be tracing through and clawing it back from, I guess, the patient. And what's your response? That's their argument. And I think with how they described it, it doesn't apply to aggregate overpayments such as a dish adjustment payment. We disagree about whether this is an aggregate overpayment adjustment, but I would also say that with respect to that argument, we know that they have forgiven dish adjustment payments. Is there any precedent that we can look to for that? Yes. In our briefs, we cite the program memorandum in 1999, in which they held harmless. That's the hold harmless agreement. There's two agreements that we're relying on in this case in terms of if you determine that this is, in fact, an overpayment, that the days should not have been included. There are two reasons why you can essentially allow the hospitals to keep this alleged overpayment. One is because they were without fault, and the second is there was a program memorandum that they issued that essentially allowed hospitals to keep dish overpayments that were in cost reporting periods. And I forget if it was for cost reporting periods beginning on or after January, or on or before January 1 of 2000, so it would cover the time period that we're talking about. And the reason that they issued that program memorandum, it was based on a letter that the CMS sent to Senator Roth that we discussed in our briefs. And in that letter, CMS acknowledges that our guidance with respect to the Medicaid fraction of the dish adjustment has not been clear, and therefore, in that case, it's been reported that there were hundreds of millions of dollars, if not billions of dollars, that the hospitals were allowed to keep nationwide. So there is clear evidence in the record that they have forgiven dish overpayments, just like they're saying now that we have a dish overpayment. They suggest that this law and this... Excuse me. The fact that the Secretary may have forgiven dish overpayments, it seems to me, is not the same as saying that statute that speaks of without fault applies to those. I mean, government can do things as a matter of grace and occasionally does, although grace is not a word that's often associated with HHS. Right? So I don't see what that... Is there any court precedent, any authority construing this statutory without fault language that indicates that your interpretation that it can apply other than to overpayments to individuals is correct? We have not found a case that applies that law in this particular instance. However, what we would suggest is that they have interpreted that law in the Medicare Intermediary Manual, and there is no such limitation in that manual to our understanding. And with respect to this just general we'll forgive some dish overpayments but not others, it's interesting that the Secretary has said in her briefs that this particular law did not underlie the but they never have said what is the authority. And then when they describe this whole harmless agreement, they try to differentiate our hospitals from the other hospitals. And they suggest, I believe in their reply brief, that those hospitals were truly without fault. And so they're using the same language of the statute, and they're saying we weren't without fault, that we should have known that the days shouldn't have been counted. However, we have a situation in which the Medicare Intermediary, the experts on Medicare, were telling the hospitals that they were entitled to count the days. So if her own expert reasonably believed that, then we believe it was a reasonable belief ourselves. What's wrong with that argument that we just heard, that under 1395 GGB, capital B, they are a provider of services who are without fault with respect to the payment that was excess over the correct amount because they are a provider of services  that they were actually told by the intermediary that they could do it over a prolonged period of time. Your Honor, that provision, 1395 GG, does not apply to dish payments, which are additional Medicare payments that only applies to payments that can be traced back to an individual for individual hospital services or medical items or services. How do we know that? The claim language of the statute itself, it says, for example, this is on Addendum 1 of our reply brief. It is entitled overpayment on behalf of individuals and settlement of claims for benefits on behalf of deceased individuals. Subsection A discusses payments to providers of services or other persons regarded as payment to individuals. There are repeated references in all of the subsections to items or services furnished to any individual. Isn't the hospital seeking here payment? Isn't that what they got, payment for services to individuals? No, Your Honor, the dish is one of these aggregate gross payments. It's an additional payment. It rolls up everything, but it's not intended to reimburse for particular services to an individual. But the word particular isn't in the statute. No, but I would also note that in the Secretary's regulation, 42 CFR 405.355 also reflects the statutory language and Plaintiff's Counsel acknowledged that they had no case law applying 1395GG and the Secretary in our brief, we cited a number of cases and I would refer, Your Honors, to the Seventh Circuit's decision of visiting nurses, which rejected the argument that GG could apply to providers and it's a very thorough analysis. And finally, the Medicare, because the statute on its face does not apply and I don't need to look at this Medicare intermediary manual because it applies to a different situation. Excuse me, before you get to this point, so how does the recoupment work with respect to individuals in a typical case? Not forgiveness, but actual recoup? So I think it would just be as outlined in the statute under 1395GGB. It says if more than the correct amount is paid under this subchapter to a provider or other person for items or services furnished to an individual, and the Secretary then has to make, I think makes a determination that it will be recouped by the state, but the statute provides for waivers of such recoupment for where the, this is the exception C, is with respect to an individual who is without fault or where the adjustment would be made by decreasing payment. So that if patient X has cardiac surgery. Yes. And the program, Medicare Medicaid, reimburses the hospital $18,000 on a $20,000 bill, and the hospital says to the individual, you owe us the $2,000 difference, and the individual pays that. He thinks he's quits with the hospital. And three years later, Medicaid CMS comes along and says to the hospital, you know, that $18,000 payment should only have been $15,000. All right? And the hospital, if it had to square that with CMS, would then have to go against the individual to get the difference. So that's the sort of situation you say 1355GG covers? Yeah, and I'm not sure about the exact mechanics of how that, but yes, that is, it's when an individual, there's a bill that is for services such as surgery at a hospital for an individual. And if the provider mistakes, mistakenly thinks it's covered by Medicare, there's some issue like that. It is not, the dish calculation, in contrast, is where you have this formula with a Medicare fraction and a Medicaid fraction, and you take a certain percentage, and it's not tied to an individual bill for services. So my time is up, unless the court has any further questions, we rest on our beliefs.